IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MARK SALTZMAN et al., | : | |
| Plaintiffs, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| INDEPENDENCE BLUE CROSS et al., | : | No. 08-3849 |
| Defendants. | : | |

**MEMORANDUM RE:  MOTION TO DISMISS AMENDED COMPLAINT**

Baylson, J.                                                                          June 5, 2009

Plaintiffs Mark Saltzman and Jan Meister initiated the current civil action against

Defendants Independence Blue Cross ("IBC"), QCC Insurance Company ("QCC"), and Keystone

Health Plan East, Inc. ("KHPE"), alleging violations of the Employee Retirement Income

Security Act ("ERISA") and several state law claims.  Presently before this Court is Defendants'

Motion to Dismiss Plaintiffs' Amended Complaint (Doc. 20).

After an extensive review of the Plan documents, considering the Third Circuit's ERISA

jurisprudence and the arguments of counsel, this Court concludes that the ERISA claim must be

dismissed.  Plaintiffs seek to recover benefits, in the form of prescription drug copayment

charges (Am. Compl. ¶ 1), which would require a ruling that Defendants' setting the copay

required for a specific drug, in this case Plavix, was improper under the terms of the Plan.

Specifically, Plaintiffs assert that because the Plan documents state that Defendants will offer

"comprehensive prescription drug coverage" at the "highest level of coverage," Defendants have

breached their commitment in the Plan with regard to Plavix by charging the highest copay under

the Plan.

The Court concludes that ERISA does not authorize a district court to award benefits by determining Defendants violated the Plan by requiring the highest level of copay for a particular drug.  The Plan documents submitted on the Rule 12 Motion clearly give Defendants the right to determine what the copay will be for providing a drug such as Plavix, and the decided cases do not allow a district court to overrule that decision and award benefits to Plaintiffs.  Plaintiffs have not cited any cases establishing their right to recovery.

As to Plaintiffs' common law counts, this Court will accede to Plaintiffs' request and dismiss those without prejudice for further proceedings in state court.

## I.     Background and Procedural History

### A.     Factual Background

The allegations in Plaintiffs' Amended Complaint concern their benefits as subscribers to medical insurance plans sold by IBC through its subsidiaries, QCC and KHPE.  In accordance with the applicable standard of review, Plaintiffs' allegations in the Amended Complaint (Doc. 14) will be accepted as true for purposes of deciding Defendants' Motion.

IBC "markets, sells, and operates" health insurance and prescription drug plans throughout several Pennsylvania counties in the Philadelphia metropolitan area.  (Am. Compl. ¶¶ 12-13).  IBC offers these health insurance benefits and prescription drug benefits through separate plans.  First, as to the health benefits, IBC primarily offers two health plans:  the Personal Choice plan and the Keystone plan.  (Am. Compl. ¶¶ 17-25).  As an optional supplement to those health plans, IBC also "markets, sells, and operates" two prescription drug plans:  the Standard Drug Program and the Select Drug Program.  (Am. Compl. ¶¶ 26-28).

Plaintiffs (and the proposed class, which has not yet been certified) are subscribers to the

Select Drug Program, which is the only prescription drug plan at issue in this litigation.  (Am.

Compl. ¶¶ 27-28).  Plaintiff Jan Meister is an employee of Stanley Creations, Inc., which

contracted with IBC, through QCC, to provide the Personal Choice health plan and the Select

Drug Program for its employees.  (Am. Compl. ¶¶ 66-70).  Plaintiff Mark Saltzman was an

employee of Gary Barbera Dodgeland from May 2005 until March 2007; Barbera contracted with

IBC, through KHPE, to provide the Keystone Health Plan and the Select Drug Program to its

employees.  (Am. Compl. ¶¶ 81-86).[1]

Plaintiffs focus their claims on the Select Drug Program's formulary.[2]  The Formulary for

the Select Drug Program provides that:

> In an effort to continue our commitment to provide you with
> comprehensive prescription drug coverage, a formulary feature is
> included in your prescription drug benefit.  A formulary is a list of
> select FDA-approved, prescription medications reviewed by the
> Futurescripts® Pharmacy and Therapeutics Committee.  These
> prescription medications have been selected for their reported
> medical effectiveness, safety, and value while providing you with
> the highest level of coverage under your prescription program.

---

[1] After Saltzman was employed with Gary Barbera Dodgeland, Saltzman also apparently received prescription drug benefits for part of the time at issue through a contract between IBC and Gary Barbera Chryslerland; this change arose out of the termination of Saltzman's employment with Barbera and his receiving benefits through COBRA.  (Defs.' Mot. to Dismiss at 9).  The two contracts with IBC—one with Dodgeland and one with Chryslerland—are effectively identical, unless otherwise noted.

[2] A formulary is a method that insurance companies use to administer prescription drug benefits.  The formulary is "a listing of medications for which an [insurer or managed care organization] provides coverage.  They come in a variety of forms.  An [insurer or managed care organization] with an 'open formulary' structure will pay for drugs that are not on the formulary[, though at the cost for the insured of a higher copayment relative to those drugs on the formulary].  A provider utilizing a 'closed formulary,' by contrast, will not cover the costs of drugs not included on the formulary."  J.B.D.L. Corp. v. Wyeth-Ayerst Labs., Inc., 485 F.3d 880, 884 (6th Cir. 2007).  As will be discussed, the prescription drug coverage for both Saltzman and Meister included an "open formulary."

(Am. Compl. ¶¶ 74, 86).  The formulary's relationship to the prescription drug benefits will be more thoroughly discussed below.  However, it is important to note here that Plaintiffs' prescription drug coverage, through the Select Drug Program Formulary, places all available prescription drugs into three different "tiers" for purposes of assigning a copayment ("copay") amount to be paid by the insured.  (Am. Compl. ¶ 78).  "A copayment is a specified dollar amount or a percentage of a contracted fee amount which IBC requires its subscribers to pay for certain medical services, including prescription drug purchases, pursuant to the IBC contracts." (Am. Compl. ¶ 77).  The formulary assigns prescription drugs into the following tiers for purposes of the copay:

- Tier 1—individuals pay the lowest copayment amount for generic drugs, whether listed on the formulary or not.

- Tier 2—individuals pay a greater copayment for brand name drugs that are listed in the formulary.

- Tier 3—individuals pay the highest copayment for brand name drugs that are not listed in the formulary.

(Am. Compl. ¶ 78).  The Rider then establishes the copayments for Meister and Saltzman, which are set at $10 for Tier 1 drugs, $20 for Tier 2 drugs, and $35 for Tier 3 drugs.  (Am. Compl. ¶¶ 80, 87).  The exclusive method of assigning brand name drugs to a tier and a copay is through the formulary.

In bringing this lawsuit, Plaintiffs take issue with IBC's handling of the prescription drug Plavix in the context of this formulary.  Plavix is an antiplatelet drug that is allegedly the most effective and successful antiplatelet drug on the market; the drug is particularly useful for individuals with a high risk of heart attack, stroke, and serious circulation problems.  (Am.

-4-

Compl. ¶¶ 88-96).  From November 1997 until January 1, 2007, Plavix was listed as a Tier 2

drug since there was no generic equivalent on the market.  (Am. Compl. ¶ 124).

Around August 2006, however, a generic version of Plavix was put on the market.  (Am.

Compl. ¶ 125).  In response and conforming with standard practice, IBC reclassified Plavix as a

Tier 3 drug and placed the generic in Tier 1, effective January 1, 2007.  (Am. Compl. ¶¶ 126-

131).  On August 31, 2006, after the generic company produced a six-month supply of the Plavix

generic, Judge Sidney Stein of the District Court for the Southern District of New York entered

an order instituting a preliminary injunction in favor of Sanofi-Aventis, the owner of the Plavix

patent, prohibiting the production of the generic due to patent infringement; a later order, entered

on June 19, 2007, granted a permanent injunction.  (Am. Compl. ¶¶ 132-138); Sanofi-Synthelabo

v. Apotex, Inc., 488 F. Supp. 2d 317 (S.D.N.Y. 2006) (granting motion for preliminary

injunction); Sanofi-Synthelabo v. Apotex, Inc., 492 F. Supp. 2d 353 (S.D.N.Y. 2007) (granting

requested permanent injunction).  Despite this change precluding the availability of the Plavix

generic, IBC did not change its classification of Plavix, and Plavix is still maintained as a Tier 3

prescription drug.  (Am. Compl. ¶¶ 139-140).

Both Saltzman and Meister take Plavix for their medical conditions.  Saltzman has been

taking Plavix from February 2007 to the present.  (Am. Compl. ¶ 141).  Saltzman was covered by

IBC's prescription plan from when he started taking Plavix until March 2008, when his COBRA

coverage lapsed a year after he ended employment with Gary Barbera Dodgeland.  (Am. Compl.

¶¶ 142-144).  Meister started taking Plavix in May 2008 and continues taking the medication to

this day.  (Am. Compl. ¶ 145).  Both Saltzman and Meister paid the Tier 3 copayment for all of

their purchases of Plavix due to the January 1, 2007 reclassification of the drug.  (Am. Compl. ¶¶

144, 146).

On the basis of these allegations, Plaintiffs contend that the classification of Plavix as a Tier 3 drug violates the terms of their insurance plans.  (Am. Compl. ¶ 147).  In particular, Plaintiffs bring three claims against Defendants.  First, in Count I, Plaintiffs bring a claim under § 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B), arguing that classifying Plavix as a Tier 3 drug, rather than a Tier 2 drug, amounts to a denial of benefits due under the "terms" of the "plan."  (Am. Compl. ¶ 179).  Next, in Count II, Plaintiffs contend, on behalf of members of a proposed class who contracted with IBC directly instead of through an employer, that the alleged acts amount to a breach of contract and a breach of the implied covenant of good faith and fair dealing.  (Am. Compl. ¶¶ 184-189).  Finally, in Count III, again on behalf of members of the proposed class who contracted with IBC directly, Plaintiffs argue that the acts amount to unjust enrichment.  (Am. Compl. ¶¶ 190-196).  Plaintiffs seek monetary, declaratory, and equitable relief.

### B.    Procedural History

On August 13, 2008, Mark Saltzman filed the initial complaint in this civil action against IBC and QCC.  (Doc. 1).  On October 10, 2008, Defendants IBC and QCC filed a Motion to Dismiss the Complaint.  (Doc. 11).  In response, Mark Saltzman, now joined by Jan Meister, filed the current Amended Complaint on November 25, 2008.  (Doc. 14).  Defendants again filed a Motion to Dismiss the Amended Complaint on January 14, 2009.  (Doc. 20).  After Plaintiffs filed their Memorandum in Opposition to the Motion (Doc. 22), Defendants filed their Reply brief (Doc. 22).  On April 17, 2009, this Court held oral argument on the Motion.  (Doc. 32-34).  After several issues were raised at the oral argument that were not discussed in the pre-argument

-6-

briefing, both Plaintiffs and Defendants, at the Court's request, submitted post-argument briefs to the Court.  (Doc. 36, 37, 39, 41).

## II.     Jurisdiction and Legal Standard

### A.     Jurisdiction

This Court has jurisdiction over the ERISA claim under 29 U.S.C. § 1132(e)(1) ("State courts of competent jurisdiction and district courts of the United States shall have concurrent jurisdiction of actions under paragraphs (1)(B) and (7) of subsection (a) of this section."), and 28 U.S.C. § 1331.  This Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

### B.     Legal Standard

When deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court may look only to the facts alleged in the complaint and its attachments.  Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1261 (3d Cir. 1994).  The Court must accept as true all well-pleaded allegations in the complaint and view them in the light most favorable to the plaintiff.  Angelastro v. Prudential-Bache Sec., Inc., 764 F.2d 939, 944 (3d Cir. 1985).

A valid complaint requires only "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009).  Iqbal clarified that the Court's decision in Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), which required a heightened degree of fact pleading in an antitrust case, "expounded the pleading standard for 'all civil actions.'"  129 S. Ct. at 1953.

The Court in Iqbal explained that, although a court must accept as true all of the factual allegations contained in a complaint, that requirement does not apply to legal conclusions; therefore, pleadings must include factual allegations to support the legal claims asserted. Id. at 1949, 1953. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. at 1949 (citing Twombly, 550 U.S. at 555); see also Phillips v. County of Allegheny, 515 F.3d 224, 232 (3d Cir. 2008) ("We caution that without some factual allegation in the complaint, a claimant cannot satisfy the requirement that he or she provide not only 'fair notice,' but also the 'grounds' on which the claim rests." (citing Twombly, 550 U.S. at 556 n.3)). Accordingly, to survive a motion to dismiss, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 129 S. Ct. at 1949 (citing Twombly, 550 U.S. at 556).

## III.    Party Contentions

### A.    Defendants' Motion to Dismiss

In their Motion, Defendants challenge the legal sufficiency of each of Plaintiffs' claims on several grounds. First, as to the ERISA claim, Defendants contend that, because the plan challenged by Plaintiffs is a welfare plan, ERISA only provides a remedy to recover benefits due under the very terms of the plan; where Plaintiffs are unable to rely on specific terms codified in the plan, ERISA does not provide a cause of action. Defendants argue that the terms of Plaintiffs' prescription drug plans confer IBC with the discretion to place Plavix in Tier 3 and that Plaintiffs were compensated according to the terms in the formulary that list Plavix at the Tier 3 copay. And to the extent that Plaintiffs seek to move Plavix into a different tier and thereby change the terms of the plan, Defendants argue that such a claim is not cognizable under

§ 502(a)(1)(B) of ERISA.

Next, Defendants contend that Plaintiffs' state law claims should be dismissed, as Plaintiffs do not have standing themselves to pursue the claim under the preemption provision of § 514(a) of ERISA, 29 U.S.C. § 1144(a).  Third, Defendants argue that Saltzman lacks standing to pursue claims for equitable or declaratory relief since he no longer receives benefits under the IBC plan.  Finally, Defendants argue that QCC should be dismissed if the case is not otherwise dismissed in its entirety because Meister failed to exhaust his administrative remedies and because Saltzman did not receive his prescription drug benefits from QCC.  As will be seen below, the Court need not reach these issues.

### B.      Plaintiffs' Opposition

In response, Plaintiffs first admit that Saltzman does not have standing to pursue his claims for declaratory and injunctive relief and agree to withdraw those claims.

As to Defendants' argument on the ERISA claim, that Plaintiffs were granted all of the benefits provided in the terms of the plan, Plaintiffs point to prefatory language in the prescription drug formulary, which states that IBC will provide "comprehensive prescription drug coverage" at the "highest level of coverage."  Plaintiffs contend that IBC's classification of Plavix as a Tier 3 drug violates this language given the efficacy and uniqueness of Plavix. Plaintiffs also argue that Defendants breached an implied covenant of good faith and fair dealing by delaying the announcement of the Plavix generic's availability for three months after it was released and not disclosing that the generic would not be available after the six month supply was exhausted.

As to Defendants' argument concerning Plaintiffs' standing to bring the state law claims,

Plaintiffs argue that the issue is more appropriately addressed at the class certification stage and, even if the issue is addressed now, Plaintiffs do have standing to bring state law claims on behalf of the class under modern case law.  Next, concerning Defendants' arguments that Meister has not exhausted his administrative remedies, Plaintiffs argue that the futility exception to the exhaustion requirement applies here since Defendants have already denied Saltzman's request and Defendants have made clear that they do not intend to move Plavix to Tier 2.  In the alternative, Plaintiffs contend that Saltzman may represent class members who do have claims against QCC, which would prevent dismissal of QCC from the case.

### C.    Defendants' Reply

In reply, Defendants argue that the prefatory language that Plaintiffs rely on for their ERISA claim is too general to provide any specific benefits and, even if it did provide benefits, is overridden by the specific provisions set out in the formulary drug listing.  Concerning Meister's failure to exhaust his administrative remedies, Defendants argue that exhaustion is not futile. Finally, as to Plaintiffs' standing to bring state law claims on behalf of the potential class members, Defendants argue that the issue of standing must be analyzed on a claim-by-claim basis and that, where the named plaintiffs do not have standing on their own to assert a claim, the claim must be dismissed.

### D.    Oral Argument and Post-Argument Briefing

At oral argument and in the post-argument briefing, Plaintiffs respond to Defendants' arguments concerning the ERISA claim by relying on two additional points.  First, Plaintiffs point to the fact that the copay tiers are designed to be "incentive-driven," whereby the lower copay for a generic incentivizes individuals to purchase a generic drug, rather than a brand name

drug, where the generic is available.  Plaintiffs argue that since no generic is available for Plavix, IBC violated Plaintiffs' rights under ERISA when it did not move Plavix back to Tier 2 in accordance with this system.  Plaintiffs also rely on the definition of "Drug Formulary" in Meister's plan, which states that the formulary is "intended to include a sufficient range of medicines to enable Physicians, dentists, and, as appropriate, other practitioners to prescribe all Medically Appropriate/Medically Necessary treatment of a Covered Person's condition."  (App. 745); (App. 752).  Plaintiffs contend that since Plavix is such an effective drug, failure to include it on the formulary violates this general definition.  Finally, Plaintiffs have also argued that IBC did not properly amend the formulary when they moved Plavix to Tier 3.

## IV.   Discussion on ERISA Claim

Plaintiffs' first and primary claim is one of the civil enforcement statutes of ERISA, 29 U.S.C. § 1132(a)(1)(B), also referred to as § 502(a)(1)(B) of ERISA.  This section provides that "[a] civil action may be brought (1) by a participant or beneficiary . . . to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."  29 U.S.C. § 1132(a)(1)(B).  As is apparent from the language of the statute, a plaintiff who brings a claim under § "502(a)(1)(B) must demonstrate that the benefits are actually 'due'; that is, he or she must have a right to benefits that is legally enforceable against the plan."  Hooven v. Exxon Mobil Corp., 465 F.3d 566, 574 (3d Cir. 2006).[3]  Benefits are only due once they become "vested."  Id.

---

[3] In Hooven, the Third Circuit reaffirmed the core principle that ERISA was the sole remedy available for those individuals who wished to sue on the basis of a pension or welfare plan.  In that case, the district court, after a bench trial, held that the plaintiffs failed on all of their ERISA claims, but had succeeded on their federal common law breach of contract claim. The district court relied on a summary plan description and found that, while not subject to

"Although it is a 'comprehensive and reticulated statute,' Nachman Corp. v. Pension Benefit Guaranty Corp., 446 U.S. 359, 361 (1980), ERISA does not set out the appropriate standard of review for actions under § 1132(a)(1)(B) challenging benefit eligibility determinations." Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 108-09 (1989). Therefore, courts have established certain principles in determining what standard of review applies depending on the circumstances. As the Third Circuit recognized in Bill Gray Enters., Inc. Employee Health and Welfare Plan v. Gourley, 248 F.3d 206, 216 (3d Cir. 2001), courts must conduct a de novo review of a company's denial of benefits unless the benefit plan endows the administrator or the fiduciary with discretionary authority to construe terms of the plan, in which case courts must then review a denial of benefits under an arbitrary and capricious standard. See also Metro. Life Ins. Co. v. Glenn, 128 S. Ct. 2343, 2347-48 (2008) (summarizing the standards of review). However,

> we must first examine whether the terms of the plan document are ambiguous. If the terms are unambiguous, then any actions taken by the plan administrator inconsistent with the terms of the document are arbitrary. But actions reasonably consistent with unambiguous plan language are not arbitrary. If the reviewing court determines the terms of a plan document are ambiguous, it must take the additional step and analyze whether the plan administrator's interpretation of the document is reasonable.

Bill Gray, 248 F.3d at 218 (holding that, where defendant's interpretation of plan was consistent

---

ERISA, the employees' performance on the summary plan description triggered a unilateral contract. The Third Circuit reversed, holding that ERISA provided the sole remedy for plan benefits, despite the fact that contract principles were still used to adjudicate ERISA claims. "Although we occasionally employ unilateral contract concepts in ERISA cases, we do so only where the asserted unilateral contract is based on the explicit promises in the ERISA plan documents themselves. Unilateral contract principles may not operate to create extra-ERISA causes of action for plan benefits." 465 F.3d at 573 (internal citations and quotations omitted).

with unambiguous terms, defendant did not violate the terms of the plan).  The threshold issue,

then, is whether the terms of the plan are ambiguous.  If they are unambiguous and Defendants'

interpretation is consistent with the unambiguous terms, then Plaintiffs' § 502(a)(1)(B) claim

must fail.

### A.    Determining What Documents Are Part of the Plan

Prior to considering whether Plaintiffs are entitled to Plavix under the "terms," this Court

must first identify which documents, and therefore what "terms," are part of the "plan."[4]  This

issue is an important one for claims under § 502(a)(1)(B) of ERISA.  Where a plaintiff brings

such a claim, it must be based on "terms" codified in "plan" documents.

> ERISA's framework ensures that employee benefit plans be
> governed by written documents and summary plan descriptions,
> which are the statutorily established means of informing
> participants and beneficiaries of the terms of their plan and its
> benefits.  Accordingly, any [plaintiff]'s right to [] medical benefits
> under a plan can only be found if it is established by the terms of
> the ERISA-governed employee benefit plan.  A court must
> examine the plan documents.  Extra-ERISA commitments . . . must
> be found in the plan documents and stated in clear and express
> language.

In re Unisys Corp. Retiree Med. Benefit "ERISA" Litig., 58 F.3d 896, 902 (3d Cir. 1995)

(internal citations omitted).  "If the plain language of the document is clear, courts must not look

to other evidence.  [Only] if the plain language leads to two reasonable interpretations [may]

courts [] look to extrinsic evidence to resolve any ambiguities in the plan document."  Bill Gray,

---

[4] Most of the documents discussed are contained in the pleadings as the Appendix to
Defendants' Motion to Dismiss the Amended Complaint (Doc. 20).  Each page in the Appendix
contains an Appendix Bates Stamp.  Citations to these documents will be made to the Appendix
Bates Stamp, unless otherwise noted.  In addition, Defendants stipulated to the authenticity of all
of the documents at issue.  See (Oral Arg. 10:18-19).  The only dispute, then, is whether the
documents are "plan documents."

248 F.3d at 218.

In their Response to the Motion to Dismiss, Plaintiffs contend that the benefits they seek to enforce (i.e., Plavix at a lower copayment) arise from the "terms" of the introductory paragraph of the formulary:

> In an effort to continue our commitment to provide you with comprehensive prescription drug coverage, a formulary feature is included in your prescription drug benefit.  A formulary is a list of select FDA-approved, prescription medications reviewed by the Futurescripts® Pharmacy and Therapeutics Committee.  These prescription medications have been selected for their reported medical effectiveness, safety, and value while providing you with the highest level of coverage under your prescription program.

(Am. Compl. ¶¶ 74, 86) (emphasis added).  Plaintiffs argue that the emphasized portions of this paragraph are the "terms" that establish a commitment on the part of IBC, under ERISA, to provide Plavix at the Tier 2 copayment due to the drug's unique characteristics and effectiveness, in the absence of a generic equivalent.  They contend that Plavix must be listed as a Tier 2 drug in order for IBC to provide "comprehensive prescription drug coverage" and provide the "highest level of coverage."  As they acknowledged during oral argument, Plaintiffs' reliance on the prefatory language in the formulary is based on the premise that the introductory paragraph of the formulary is part of the "terms" of the "plan."  However, Plaintiffs contend that the drug listing, which places the drugs into different tiers and classifies Plavix as a Tier 3 drug, is not part of the "terms" and is instead only IBC's administration of the plan.  See (Pls.' Mem. In Opp. at 14); (Oral Arg. 8:23-9:3); (Oral Arg. 20:7-21:21).

At oral argument and in subsequent briefing, Plaintiffs also rely on certain parts of the Prescription Drug Rider.  One of the principles they rely on is the incentive-based system of the

copayments.  Plaintiffs point to the fact that the three-tier copayment system is designed such that the brand name drug first comes onto the formulary in the middle tier when there is no generic available, and then, when the generic becomes available, "the incentive is to get the doctors to prescribe[,] and patients to accept[,] the generic [by assigning the generic a] lower copay" and the brand name drug a higher copay.  (Oral Arg. 28:2-16); (Oral Arg. 32:7-23); see also (Am. Compl. ¶ 79).  However, Plaintiffs have not identified any language in the plan documents that specifically establishes this principle, and have only attempted to infer it from the plan's copay assignment.  Also, Plaintiffs rely on the definition of "Drug Formulary" in the Meister Prescription Drug Rider, which states that the formulary is "intended to include a sufficient range of medicines to enable Physicians, dentists, and, as appropriate, other practitioners to prescribe all Medically Appropriate/Medically Necessary treatment of a Covered Person's condition." (App. 752).  Plaintiffs argue that the drug formulary does not include all "Medically Appropriate/Medically Necessary" drugs where Plavix, being such a uniquely effective drug, is not on the list and is thus not a Tier 2 "brand name formulary" drug.  (Oral Arg. 24:19-25:15).

Defendants, in response, argue that the formulary in its entirety is a plan document and that the formulary drug listing is therefore part of the "terms" of the "plan."  Defendants contend that the drug listing is the more specific provision of the plan, as opposed to the prefatory paragraph of the formulary or the one definition relied on by Plaintiffs, and, using established principles of contract interpretation, the more specific provisions of the formulary drug listing should override the more general provisions.  As to the principle of an "incentive-driven" formulary, Defendants argue that this principle is not part of the "terms" of the "plan," and even if it was, the drug listing is again a more specific provision that overrides the general nature of

the incentive-driven scheme.

Neither party has offered any caselaw to support their respective position on which documents are part of the "plan."  Prior to deciding which documents should be included, this Court will first summarize the documents that are at issue.

### 1.    Summary of the Documents at Issue

#### a.    Saltzman Plan

When he was insured, Saltzman was a subscriber to insurance plans from both KHPE and QCC.  The QCC plan, however, is not at issue here since it did not offer prescription drug benefits. (App. 224, 227) ("Except as specifically provided in this Contract, no benefits will be provided for services, supplies or charges . . . [f]or Prescription Drugs"); (App. 519, 522) (same).

Saltzman's plan through KHPE, however, did provide the drug benefits at issue.[5] Saltzman's plan has two relevant parts:  (a) what this Court will refer to as the "parent contract" and (b) the Prescription Drug Rider.

### SALTZMAN PARENT CONTRACT PROVISIONS

### Benefits Subject to Copay

The parent contract provisions state that prescription drug coverage is an option for Saltzman's plan.  However, it also specifically notes that the insurer may set a higher copay for certain drugs.

---

[5] As briefly noted above, Saltzman began taking Plavix in February of 2007 and continued taking the drug up to the point when his insurance lapsed in March of 2008.  (Am. Compl. ¶ 141).  However, it appears from the briefs on this Motion that Saltzman switched from the Barbera Dodgeland contract to the Barbera Chryslerland contract when his employment terminated with Barbera Dodgeland in March of 2007 and his coverage through COBRA came into effect.  See (Defs.' Mot. to Dismiss at 9).  As both contracts are relevant to the case at hand, citations will be made to both contracts, and any differences will be noted.

- "Groups may choose to provide additional Prescription Drug coverage for Prescription Drugs for use when a Member is not an inpatient.  The Benefits and Copayments will vary depending upon the program chosen.  That coverage may also include a Formulary.  If so, Members will be given a copy of the Formulary, and the <u>coverage may exclude, or require the Members to pay higher Copayments for, certain Prescription Drugs</u>.  To obtain a copy of the Formulary, the Member should call Member Services at the phone number shown on the ID card."  (App. 69) (emphasis added); (App. 298).

IBC's Discretion to Amend

The parent contract also includes several provisions that establish the insurer's ability and discretion to amend the terms of the plan:

- "<u>[KHPE] may amend this Contract with respect to any matter</u>, including required payments, by mailing a postage prepaid notice of the amendments to the Group at its address of record with Keystone, at least thirty (30) days before the effective date of the amendment.  The Group's concurrence with such amendments shall be established by continuation of payment for coverage hereunder after the effective date of the amendment."  (App. 62) (emphasis added); (App. 269).

- "<u>[KHPE] may, at its option, amend this Contract at least annually</u>.  If the Group does not agree to such change(s), the Group must notify [KHPE] in writing, within thirty (30) days, and the Group may terminate this Contract at the end of the then current Contract term."  (App. 70) (emphasis added); (App. 271).

- "<u>[T]his Contract shall be subject to amendment</u>, modification, or termination in accordance with any provision hereof or by mutual agreement between [KHPE] and the Group without the consent or concurrence of the Members.  By electing [KHPE] or accepting [KHPE] Benefits, all Members legally capable of contracting, and the legal representatives of all Members incapable of contracting, agree to all terms, conditions, and provisions hereof."  (App. 105) (emphasis added); (App. 271).

SALTZMAN PRESCRIPTION DRUG RIDER

Benefits Subject to Copay

The second part of Saltzman's plan is the Prescription Drug Rider.  <u>See</u> (App. 157); (App. 437).  The Rider first establishes the right to prescription drug benefits, but again warns

-17-

individuals several times that the benefits are subject to the copayment schedule:

- "The Prescription Drug Benefits shall be available for Covered Drugs or Supplies dispensed pursuant to a Prescription Order for the out-of-Hospital use of the Member. **PRESCRIPTION DRUG BENEFITS ARE SUBJECT TO SECTION SC - SCHEDULE OF COPAYMENTS & LIMITATIONS**." (App. 160) (emphasis in original); (App. 437).

- "Covered Drugs or Supplies furnished by a Participating Pharmacy [are covered] without charge <u>except for the Drug Copay</u> for each Prescription Order or Refill." (App. 160) (emphasis added); (App. 437).[6]

- "A Member shall pay to a Participating Pharmacy . . . C. The Prescription Drug Copayment as specified in SECTION SC - SCHEDULE OF COPAYMENTS & LIMITATIONS." (App. 165); (App. 444).

In the Chryslerland contract, the Prescription Drug Benefits Summary also indicates that:

- "Prescription Drugs contained in the Drug Formulary will be Prescribed and dispensed whenever appropriate, pursuant to the professional judgement of the Primary Care Physician, Referred Specialist and/or the Pharmacist. <u>Covered Drugs not listed in the drug Formulary shall be subject to the Non-Formulary Drug Copay</u>. Members will be given a copy of the Formulary and the <u>coverage may exclude, or require, the Member to pay higher Copayments for certain Prescription Drugs</u>. To obtain a copy of the Formulary, the Member should call Member Services at the phone number shown on the back of the ID card." (App. 437) (emphasis added).

As with the parent contract provisions, these Rider provisions make clear that, while the plan includes prescription drug benefits, the insurer has the discretion to set higher copayments for certain drugs.

<u>Tier Assignment of Drugs with Formulary</u>

The section that specifically governs the copay assignment in the Prescription Drug Rider

---

[6] "Covered Drugs or Supplies" are defined in the contract as "drugs or supplies approved under Federal Law by the Food and Drug Administration for general use, and limited to the following: A. Prescription Drugs Prescribed by a Primary Care Physician or Referred Specialist subject to the Prescription Drug Exclusions, and other exclusions listed in the Handbook or Contract." (App. 166); (App. 447).

is "Section SC - Schedule of Copayments & Limitations."  (App. 164); (App. 445).  Where the

insured fills their prescription at a "Participating Pharmacy":

- Tier 1—"Generic Formulary Drugs" are assigned a $10 copayment;

- Tier 2—"Brand Name Formulary Drugs" are assigned a $20 copayment; and

- Tier 3—"Non-Formulary Drugs" are assigned a $35 copayment.

<u>Definitions</u>

The following are the relevant definitions provided in the Rider:

- Brand Name Drug—"a single source, FDA approved drug manufactured by one company for which there is no FDA approved substitute available."  (App. 166); (App. 447).

- Non-Formulary Drug—"[a] Covered Prescription Drug not included in the Drug Formulary."  (App. 158); (App. 442).

- Drug Formulary—"a listing of Prescription Drugs preferred for use by the HMO. <u>This list shall be subject to periodic review and modification</u> by the HMO."  (App. 157) (emphasis added); (App. 441).  The Chryslerland contract also notes in the "Drug Formulary" definition that "Covered Drugs not listed in the Drug Formulary <u>shall be subject to the Non-Formulary Drug Copay</u>."  (App. 441) (emphasis added).

These definitions only serve to reiterate that the insurer has the discretion to determine

what drugs get assigned to each tier and that the drug benefits are subject to the assigned

copayment amount.

The parties do not dispute that the Saltzman parent contract and the Prescription Drug

Rider issued by KHPE are part of Saltzman's "plan."  This Court will therefore consider it for

purposes of Plaintiffs' ERISA claim.

**b.    Meister Plan**

As with Saltzman's plan, Meister's plan is broken up into two parts:  (a) the parent

contract provisions and (b) the Prescription Drug Rider.

MEISTER PARENT CONTRACT PROVISIONS

IBC's Discretion to Amend

As for Meister's plan issued by QCC,[7] all of the relevant portions of the plan are included

in the Prescription Drug Benefit Amendment Rider with one exception.  (App. 745); (App. 752).

However, the parent contract provisions do provide that:

- "The Carrier may, at its option, amend this Contract at least annually.  If the Group does not agree to such change(s), the Group must notify the Carrier and the Group may terminate this Contract at the end of the then current contract term." (App. 626) (emphasis added); (App. 761).

MEISTER PRESCRIPTION DRUG RIDER

As for the remainder of the plan, the Rider establishes that "[b]enefits will be provided

for covered Prescription Drugs and medicines prescribed by a Physician and dispensed by a

licensed Pharmacy.  Benefits for Prescription Drugs are available for a thirty (30) day supply, or

the appropriate therapeutic limit, whichever is less, when dispensed from a retail Pharmacy."

(App. 749); (App. 754).

Benefits Subject to Copay

The Rider then establishes the copayment schedule for the prescription drug benefits.

(App. 747); (App. 753-54).  Where a "Preferred Provider" is used, the copayments are as

follows:

---

[7] The IBC plan with Stanley Creations, through IBC's subsidiary QCC, was apparently amended once during the period at issue.  (Defs.' Mot. to Dismiss at 12).  The first contract, between QCC and Stanley Creations, was effective as of October 1, 2003.  (App. 752).  The second contract was effective as of October 1, 2008.  (App. 623).  Both contracts are identical, unless otherwise noted, and citations will be made to both contracts.

- Tier 1—"Generic Formulary" drugs are assigned a $10 copayment;

- Tier 2—"Brand Name Formulary" drugs are assigned a $20 copayment; and

- Tier 3—"Non-Formulary" drugs are assigned a $35 copayment.

<u>Definitions</u>

The Rider also provides several relevant definitions:

- Drug Formulary—"a list of drugs, usually by their generic names, and indications for their use.  A formulary is intended to include a sufficient range of medicines to enable Physicians, dentists, and, as appropriate, other practitioners to prescribe all Medically Appropriate/Medically Necessary treatment of a Covered Person's condition."  (App. 745); (App. 752).

- Brand Name Drug—"a Prescription Drug produced by a manufacturer awarded the original patent for that specific drug or combination of drugs and satisfying the requirements of the [FDA] and applicable state law and regulation."  (App. 745); (App. 752).

- Generic Drugs—"any form of a particular drug which is sold by a manufacturer other than the original patent holder, approved by the FDA as generically equivalent, and in compliance with applicable state laws and regulations."  (App. 746); (App. 752).

- Prescription Drug—"(a) any medication approved by the Carrier and which by Federal and or state laws may be dispensed with a Prescription Order, and (b) insulin.  <u>The list of covered Prescription Drugs is subject to change from time to time at the sole discretion of the Carrier.</u>"  (App. 746) (emphasis added); (App. 753).

While Meister's plan is not as descriptive as Saltzman's, it still establishes the

requirement of a copayment for drugs and the insurer's ability to amend the plan.

As with Saltzman, the parties do not dispute that the parent contract provisions and the

Prescription Drug Rider are part of Meister's "plan."  This Court will therefore also consider it

for purposes of the ERISA claim.

### c.      Formulary

A copy of the drug formulary that both plans refer to is also attached and is entitled the

Select Drug Program Formulary effective January 1, 2007.  (App. 591).  As Plaintiffs note, the

formulary begins with an introduction to the purpose of the document:

> • "In an effort to continue our commitment to provide you with comprehensive prescription drug coverage, a formulary feature is included in your prescription drug benefit.  A formulary is a list of select FDA-approved, prescription medications reviewed by the Futurescripts® Pharmacy and Therapeutics Committee.  These prescription medications have been selected for their reported medical effectiveness, safety, and value while providing you with the highest level of coverage under your prescription program."  (App. 593).

The formulary then goes on to describe how to identify which drugs in the drug listing are

assigned to which copay:

> • Tier 1—a drug that is bolded is assigned the lowest copay and is considered to be a "Formulary Generic."  (App. 593).

> • Tier 2—a drug that is non-bolded is assigned the middle copay and is considered to be a "Formulary Brand."  (App. 593).

> • Tier 3—a drug that is placed within parentheses is assigned the highest copay and is considered to be a "Non-Formulary Brand Drug."  (App. 593).  Where a "Covered Brand Drug[]" is not listed, it is considered to be "Non-Formulary" and assigned the highest copay.  (App. 593).

On the next page, the formulary again notes that the drug listing "is subject to change."

(App. 594) (emphasis added).

Since Plavix is not included on the drug listing, it falls within the formulary's definition

of a "Non-Formulary Brand Drug."

As discussed above, there is a dispute between the parties as to whether the formulary

should be considered part of the "plan."  Plaintiffs argue both that, first, the prefatory language

referring to "comprehensive prescription drug coverage" and the "highest level of coverage" is

part of the plan, while the drug listing that follows is not; and second, in the alternative, that the formulary is not part of the plan at all.  Plaintiffs make the latter argument despite the fact that, in the Amended Complaint, they alleged that the formulary was incorporated into the plan.  (Am. Compl. ¶ 73) ("The Formulary is incorporated into and made part of both the Keystone and Personal Choice IBC Contracts.").  Defendants, on the other hand, argue that the entire formulary is part of the plan for purposes of ERISA.

### d.   Letter Template Notifying of Change in Formulary

The next document, which Plaintiffs contend is a plan document, is a template of a letter and is attached to Plaintiffs' Amended Complaint as Exhibit D.  The template, dated February 2008, is apparently used to notify individuals insured through IBC that a prescription drug they take is being moved from Tier 2 to Tier 3 on the formulary.  The letter begins by stating:  "We are writing to provide you with advance notification of changes we are making to the Select Drug Program® formulary that may affect you, and to tell you about some of the steps you might wish to take in response to these changes."  The letter goes on to notify the recipients of the tier change if a drug that they are taking is one of the drugs being reassigned:  "As of April 1, 2008, we will remove some drugs from our list of approved drugs, or formulary.  Our records indicate that you or someone covered by your plan currently uses one or more of the medication(s) listed below that are being removed."

The letter then provides language similar to the prefatory language in the formulary:

> The Select Drug Program formulary includes all generic drugs and some brand drugs that have been selected for their medical effectiveness, safety, and value.  The FutureScripts® Pharmacy and Therapeutics Committee, whose members include practicing physicians and pharmacists from the area, regularly reviews the

> formulary and safe prescribing procedures to ensure their continued
> effectiveness.  Shortly you should receive the general Select Drug
> Program and Procedures That Support Safe Prescribing update in
> the Spring 2008 issue of <u>Update</u> magazine.  You can access the
> entire formulary guide at www.ibxpress.com.

Finally, the letter informs individuals of what options are available now that a drug they use is being reassigned to Tier 3.  It first notes that, "[a]fter April 1, you will still be able to obtain the medication being removed from the Select Drug Program formulary, but <u>your cost will be at the highest non-formulary level of cost-sharing</u>."  (emphasis added).  It then goes on to provide the available options:  individuals may be able to instead take a generic version of their prescription at the lower copay, use an alternative brand name drug, continue on the current medication at the higher copay, or seek an exception to the copay through an administrative process.  Importantly, the letter again warns individuals that, where they decide to continue taking the brand name version of their prescription, "<u>you will be responsible for the highest, non-formulary cost-sharing</u>."  (emphasis added).

Plaintiffs contend that this letter should be considered a plan document, though they offer little in the way of rationale other than the fact that it was a communication to insured individuals concerning their plan.  Defendants, on the other hand, argue that these documents are only communications between the insurer and the insured and can not be relied on by Plaintiffs as plan documents.

     **e.**     **IBC Webpage Reflecting Tier Status of Antiplatelet Drugs**

Next, Plaintiffs offer an internet webpage as a plan document and attach it to Plaintiffs' Amended Complaint as Exhibit H.  The webpage, which appears to be from IBC's own website, is a list of drugs that are used for "Coagulation Therapy, Antiplatelet Drugs."  For each of the six

-24-

drugs that are listed, the webpage includes their name as a brand name drug, their generic name, the dosage that is typically administered for the drug, what tier status the drug is in, whether prior authorization is required for the drug to be covered, and whether the generic is available.  The webpage states that, "[i]f the drug does not appear on the list or is listed as non-formulary (Tier 3), the member is responsible for higher out-of-pocket expense.  The list of drugs includes formulary agents, as well as non-formulary agents that have pharmacy edits associated with them."  (emphasis added).  The webpage includes Plavix as an entry.  The page notes that Plavix is a Tier 3 drug and that there is no generic version of it available.  Finally, at the bottom, the webpage's disclaimer states that "[t]he formulary status of a drug is subject to change."

Plaintiffs also contend that this webpage is a plan document.  Defendants argue again that the webpage is only a communication between the insurer and the insured and is not a binding document.

### f.    IBC Newsletter - "Partners in Health Update"

Finally, Plaintiffs offer an issue of a newsletter from IBC as a plan document, which is attached to Plaintiffs' Amended Complaint as Exhibit E.  The newsletter, dated December 2006, is called Partners in Health Update, and it appears to be a monthly newsletter detailing changes in IBC's insurance coverage.  Page 8 of the newsletter contains a notice that Plavix would no longer be classified as a Tier 2 drug and would be moved to Tier 3.  At the beginning of the notice, the newsletter contains language that is similar to the prefatory language in the formulary:  "The Select Drug Program® Formulary is a list of FDA-approved medications that were chosen for their effectiveness and value.  The list changes periodically as the Pharmacy and Therapeutic Committee reviews the formulary to ensure its continued effectiveness.  Below is a list of the

most recent changes."  On the following page, the newsletter includes a notice regarding a

change to Plavix in the section entitled "Brand Deletions," which states that "[t]hese Brand

Drugs are covered at the appropriate Non-Formulary copayment:  Effective January 1, 2007."

On page 14, the newsletter includes some additional language relevant to whether it is a

plan document:

> This is not a statement of benefits.  Benefits may vary based on
> state requirements, product line (HMO, PPO, Indemnity, etc.),
> and/or employer groups.  Providers should call Provider Services,
> listed at right, for the member's applicable benefit information.
> Members should be instructed to call the number on the back of
> their identification card.

(emphasis added).

Plaintiffs again argue that this newsletter, as a communication, is a plan document.

Defendants argue, as they did with the letter and the webpage, that the newsletter is only a

communication, that the newsletter was only sent to medical providers, and that it is not a plan

document that binds IBC to provide benefits.

### 2.       Caselaw on When Documents Are "Terms" or "Plan" Documents

As discussed above, under § 502(a)(1)(B), a plaintiff may only enforce the "terms"

included in a "plan" document.  The difficult issue in this case is identifying which documents or

what language in certain documents are part of the "terms" of the "plan," other than Plaintiffs'

parent contracts and their prescription drug riders.  ERISA "clearly contemplate[s] that there are

documents other than the [summary plan description and the contract] which control the

operation of the plan."  Heffner v. Blue Cross and Blue Shield of Ala., 443 F.3d 1330, 1341

(11th Cir. 2006).

-26-

The parties have not identified and this Court has not found any Third Circuit cases that specifically discuss when documents become part of the "plan." This Court has found the Eleventh Circuit to be unique in that it has specifically outlined what types of documents are part of an individual's "plan" and upon which plaintiffs may rely for a § 502(a)(1)(B) claim. Documents may be enforced, and are part of the plan, if they

> (1) 'provide a procedure for establishing and carrying out a funding policy,' (2) 'describe . . . the operation and administration of the plan,' (3) 'provide a procedure for amending [the] plan' or 'for identifying the persons who have authority to amend the plan,' [] (4) 'specify the basis on which payments are made to and from the plan,' [or (5)] 'other instrument[s] under which the plan was established or is operated.'

Cotton v. Mass. Mut. Life Ins. Co., 402 F.3d 1267, 1274 n.8 (11th Cir. 2005) (quoting ERISA § 402(b), 29 U.S.C. § 1102(b); ERISA § 104(b)(2), 29 U.S.C. § 1024(b)(2)).

In Cotton, the plaintiffs appealed a district court's holding, after a bench trial, that projections concerning the benefits of a retirement/death benefits policy were not "plan documents" or "summary plan descriptions" that could be enforced by an insured. On appeal, the Eleventh Circuit affirmed, holding that these documents did not fall into any of the above categories for plan documents. "The policy projections do not govern plan management, amendment, or administration; rather, they simply project future benefit levels based on certain economic assumptions. Therefore, they are not plan documents and provide no basis for a § 502(a)(1)(B) claim unless" they amount to summary plan descriptions; the court ultimately held that they were not summary plan descriptions, either. 402 F.3d at 1274 n.8.

In Heffner, the Eleventh Circuit considered a district court's decision to certify a class of plaintiffs, who sought "a refund of their calendar year deductibles from their common claims

-27-

administrator, Blue Cross and Blue Shield of Alabama (Blue Cross).  They claim[ed] that [] the summary plan descriptions (SPDs) issued by Blue Cross in connection with their respective plans stated that there was no calendar year deductible," and they therefore brought a claim under § 502(a)(1)(B) of ERISA.  443 F.3d at 1333.  The district court certified the class under Rule 23(b)(2), but the Eleventh Circuit reversed after noting that a class could not be certified under this Rule where each plaintiff is required to show reliance on the SPD.  Id. at 1340-44.  The court recognized that, under the current caselaw in the Eleventh Circuit, plaintiffs were required to each show individualized reliance on the SPD where the insurer sought to enforce the terms of another document that was part of the plan.  Id. at 1340.  While the plaintiffs argued that the SPD purported to be the exclusive plan document, the court rejected the argument.  The court came to this conclusion for three reasons:  (1) ERISA contemplated documents other than the SPD, (2) the SPD clearly contemplated other documents that were part of the plan, and (3) certain SPD "provisions apprise participants and beneficiaries that in order to be fully aware of their plan's coverage, they must refer to the contract, which includes" other documents.  Id. at 1343.  Since other documents were part of the "plan" and since they conflicted with the SPD, "each plaintiff in this class action must prove reliance on the 'no deductible' language," and class certification under Rule 23(b)(2) was therefore precluded.  Id.

The Eleventh Circuit later relied on the same principle—that a document is enforceable if an established part of the plan requires that the insured refer to the document—in determining whether memoranda were plan documents in Schena v. Met. Life Retirement Plan for U.S. Employees, 244 Fed. Appx. 281 (11th Cir. 2007).  The court in Schena considered memoranda that were issued to employees of a company that was acquired by Met Life, which assured the

acquired employees that their new pension would be credited for their prior years of service; actual plan documents for the pension that were later issued stated otherwise.  In determining whether these memoranda could be enforced, the court emphasized the fact that these memoranda had no control over the operation of the pension plan:  "They deal with a wide range of transfer-related topics and only touch on retirement plan issues.  They are not contracts or instruments under which the plan 'was established or is operated.'"  Id. at 285.  The court also noted that the memoranda "explicitly discount[ed] their own significance" and "warn[ed] readers to look elsewhere to determine the precise details of their new benefit programs."  Id.  The court therefore held that the memoranda were not "plan" documents and the terms of the memoranda could not be enforced through ERISA.  Id.

### 3.   Which Documents Are Part of the Plan

### a.   Whether the Formulary is a Plan Document

Utilizing these principles, this Court holds that the formulary, in its entirety, is a plan document.  First, the formulary is referred to at several points within the parent contract and the Prescription Drug Rider for both Saltzman and Meister.  For instance, in Saltzman's parent contract, it specifically provides that, if the employer decides to provide prescription drug coverage, the coverage "may also include a Formulary.  If so, Members will be given a copy of the Formulary, and the coverage may exclude, or require the Member to pay higher Copayments for, certain Prescription drugs."  (App. 69); (App. 298).  In Saltzman's Rider, the provisions refer to the formulary as being utilized to define the drug benefits of the plan at three different points:

- First, in the Definitions section, where it defines Drug Formulary as "a listing of Prescription Drugs preferred for use by the HMO.  This list shall be subject to periodic review and modification by the HMO."  (App. 157); (App. 441).

- Second, indirectly in the Schedule of Benefits, which notes that the prescription drug benefits are subject to the copay system established in the Schedule of Copayments and Limitations.  (App. 160); (App. 437).

- Third, in the Schedule of Copayments and Limitations, which provides that, if the prescription is filled at a Participating Pharmacy, a Brand Name Formulary Drug has a copayment of $20, while a Non-Formulary Drug has a copayment of $35.  (App. 164); (App. 445).

As for Meister's plan, the Rider also refers to the formulary at several points.  For example, in the Prescription Drug Benefit Amendment Rider, the term "drug formulary" is defined as follows:

- Drug Formulary—"a list of drugs, usually by their generic names, and indications for their use.  A formulary is intended to include a sufficient range of medicines to enable Physicians, dentists, and, as appropriate, other practitioners to prescribe all Medically Appropriate/Medically Necessary treatment of a Covered Person's condition."  (App. 745); (App. 752).

In addition, as with Saltzman's plan, the term "formulary" is referred to and utilized in the schedule of copayments.  The schedule assigns a copay for brand name drugs based on whether they are listed on the formulary or not.  (App. 747); (App. 753-54).

These provisions show that the copayment system of the prescription drug benefit for both Plaintiffs is administered and operated by using the drug formulary.  In order to determine the copay for brand name drugs, both the insurer and the insured must refer to the drug listing in the formulary.  Without the formulary, both parties would be unaware of exactly how much the insurer would pay for a prescription drug, and therefore how much the insured would be required to copay.  Simply put, the formulary is essential to the "operation and administration" of both Plaintiffs' plans, from the perspective of the insurer and the insured.  And contrary to Plaintiffs' position, this particularly applies to the drug listing portion of the formulary.  From the

-30-

perspective of the insurer and the insured, the part of the formulary that is crucial to understand how the drug benefits are administered and operated is the drug listing, not the prefatory paragraphs.

In addition, using the standard from Heffner and Schena, the references to the formulary throughout Plaintiffs' parent contract provisions and prescription drug riders put an insured on notice that they must refer to the formulary to be aware of the scope of their benefits as it relates to prescription drugs. These references sufficiently communicate to an insured that the formulary is an essential document to understanding what benefits they are to receive and how much they will be expected to pay for a particular prescription. In other words, it would be impossible for an individual to know what copayment they are required to pay for brand name drugs without referring to the formulary.

As the plans at issue in this case put Plaintiffs on notice that the formularies are utilized to administer the plan, and since the formulary is a document that is crucial to the operation and administration of the plan, the formulary in its entirety is a plan document and will be considered part of the "terms" of the "plan" for purposes of ERISA. The formulary must then be considered in conjunction with the parent contract provisions and the prescription drug riders.

On a related issue, Plaintiffs, in their supplemental briefing, appear to argue that IBC failed to provide sufficient notice that Plavix would be moved to Tier 3 and failed to provide notice that the Plavix generic was no longer available on the market. (Doc. 39 at 8). Plaintiffs seem to suggest that these acts made the placement of Plavix into Tier 3 ineffective.[8] However,

_____

[8] While Plaintiffs seemed to suggest that this alleged failure to disclose was an independent violation of ERISA, they did not identify the specific civil enforcement provisions upon which they sought relief. (Doc. 39 at 8-9). After Defendants responded by analyzing the

Plaintiffs cannot use this argument in support of their current § 502(a)(1)(B) claim because "[t]he injury produced by reporting and disclosure violations [is generally] not remediable under section 502(a)(1)(B)." Hozier v. Midwest Fasteners, Inc., 908 F.2d 1155, 1169 (3d Cir. 1990).

The Third Circuit has offered two standards for determining whether reporting and disclosure violations allow a court to set aside an amendment. First, the court has recognized that "there are situations, usually presenting extraordinary circumstances, where the remedy of striking a plan amendment may be available," particularly where the defendant either "acted in bad faith" or the defendant "actively concealed a change in a benefit plan, and the covered employees have been substantially harmed by virtue of the employer's actions." Lettrich v. J.C. Penney Co., 90 Fed. Appx. 604, 613 (3d Cir. 2004) (quoting Ackerman v. Warnaco, Inc., 55 F.3d 117, 125 n.8 (3d Cir. 1995)). Plaintiffs have not alleged either bad faith or active concealment here.

As to the second standard, the Third Circuit has also indicated that a term of a plan can be set aside in a § 502(a)(1)(B) case where the terms themselves require such a remedy. In Jordan v. Fed. Express Corp., 116 F.3d 1005 (3d Cir. 1997), the plaintiff was a retiree who sued the administrator of his pension plan for failing to inform him that his initial choice for structuring his retirement plan was irrevocable. The plaintiff brought suit under § 502(a)(1)(B) of ERISA, arguing that the defendant's breach of the disclosure obligations of ERISA and the terms of the plan voided the defendant's reliance on the irrevocability of the plan structure. The district court granted summary judgment for the defendant, and the Third Circuit affirmed and, although

---

claim under both § 502(a)(1)(B) and § 502(a)(3) of ERISA (Doc. 41), Plaintiffs later replied that they had no intent to seek relief pursuant to § 502(a)(3). (Doc. 52 Ex. A at 1). This Court will therefore limit its analysis of Plaintiffs' proposed claim to § 502(a)(1)(B).

noting that the plan established reporting and disclosure obligations on the plan administrator, and the plan administrator violated those obligations, nonetheless held that "[e]ven if the plans' disclosure violations led Jordan to make an uninformed retirement selection, he cannot bring a § 502(a)(1)(B) claim where his 'plan defines the scope of entitlements it creates without any reference to reporting and disclosure issues.'"  116 F.3d at 1011 (quoting Hozier, 908 F.2d at 1168).  The court held that "[t]his is such a case."  Id.

The Third Circuit's Jordan decision provides that, while the terms of the plan may make reference to reporting and disclosure obligations, a defendant's violation of those obligations do not void a defendant's reliance on terms of the plan unless the terms themselves require it. Plaintiffs have not identified any terms in the plan here that require this Court to set aside an amendment, and this Court can find none.  Therefore, IBC's placement of Plavix in Tier 3 will be considered a valid amendment.

### b.    Other Documents

As for the remaining documents that Plaintiffs offered as plan documents, these documents are of a significantly different nature than the formulary, the parent contracts, and the prescription drug riders.  Plaintiffs argue that the contract contemplates amendments, and therefore these are plan documents.  However, all of the documents concede on their face a lack of authority and instead rely on the authority of the formulary and the other plan documents.

As for the letter template that notifies individuals of formulary changes to their prescription drugs, (Am. Compl. Ex. D), the first complication is that this document is only a template.  Plaintiffs have not asserted that the actual template was mailed to individuals.  And, even if it was, there is no mention of Plavix in the template.  The letter is also dated February

2008, which is over a year after Plavix was switched to Tier 3.  With such a lapse in time, even if

this Court assumes that a letter like this one was sent out when Plavix was changed, it is not

known whether the letter was in a different form back in January 2007.  Plaintiffs have not

offered the actual letter that was sent to individuals notifying them of the Plavix tier change.

More importantly, even if this Court assumes that this letter was sent to individuals, this is only a

letter which notifies individuals that a drug has been moved to a different tier on the formulary.

The letter refers to the formulary as a controlling document and simply notifies individuals that

Plavix has changed tiers on the formulary.  This document does not appear to have any

independent authority, and the parties do not rely on this letter as an "instrument[] under which

the plan was established or is operated."  Cotton, 402 F.3d at 1274 n.8.

It is clear from this letter that the formulary is still the controlling document.  Indeed, the

letter looks much like the memoranda in Schena, which only referred to the actual contracts and

which the court held were not plan documents.  And, even if this Court were to find that this

letter is a plan document, it is unclear how these letters would support Plaintiffs' argument.  In

fact, the letter warns individuals twice that, if they continue to take the drug moved to Tier 3, the

copay "will be at the highest non-formulary level of cost-sharing."  However, given the nature of

the letter and how it is utilized for the plan, this Court holds that the letter template is not a plan

document for purposes of Plaintiffs' ERISA claim.

Next, as to the webpage, (Am. Compl. Ex. H), this Court is again unable to understand

how this document supports Plaintiffs' argument.  The webpage specifically notes that Plavix is a

Tier 3 drug and that, "[i]f the drug does not appear on the list or is listed as non-formulary (Tier

3), the member is responsible for higher out-of-pocket expense."  At the bottom, it also includes

the disclaimer that "[t]he formulary status of a drug is subject to change."  These statements strongly support Defendants' arguments that the prescription drug plan only provides for a Tier 3 copay for Plavix and that IBC had the discretion to move Plavix to Tier 3.  But regardless of whose argument it supports, this Court holds that the webpage is not a plan document for purposes of Plaintiffs' ERISA claim.  The webpage repeatedly refers to the formulary, and the information on this page simply summarizes the formulary status of Plavix and the other antiplatelet drugs.  It is clear that this webpage is not the controlling authority on what copay is applicable to each of the drugs since it relies on the formulary to make that determination.  Therefore, this webpage is also similar to the memoranda in Schena and is not an "instrument[] under which the plan was established or is operated."  Cotton, 402 F.3d at 1274 n.8.

Finally, as to the Partners in Health Update, (Am. Compl. Ex. E), Plaintiffs' argument that this document is a controlling authority is clearly undercut by the language in the document itself.  The Update specifically states that "[t]his is not a statement of benefits.  Benefits may vary based on state requirements, product line (HMO, PPO, Indemnity, etc.), and/or employer groups.  Providers should call Provider Services, listed at right, for the member's applicable benefit information."  The document "explicitly discount[ed]" any authority, as the memoranda did in Schena, and warns readers that they should not rely on the document as a plan document.  The Update, like the webpage, only summarizes how the formulary classifies drugs and announces any changes.  The newsletter explicitly relies on the formulary's authority.  It is again important to note that it is unclear as to how the document supports Plaintiffs' argument.  The document notifies individuals that Plavix has been assigned to Tier 3 and that it is now "covered at the appropriate Non-Formulary copayment" as of January 1, 2007.  While there is some language

stating that the formulary drugs "were chosen for their effectiveness and value" and that the drug committee picks drugs "to ensure [the formulary's] continued effectiveness," this language is almost identical to the language in the formulary.  However, in reviewing the Update, it is clear that it is not an "instrument[] under which the plan was established or is operated."  Cotton, 402 F.3d at 1274 n.8.  The Update, and the other documents, are therefore not plan documents for purposes of Plaintiffs' ERISA claim.

**B.      Interpreting the "Terms" of the Plan**

Now that the Court has determined which documents are "plan documents," the next determination is whether Plaintiffs' claim for benefits is valid under the "terms" of these plan documents.

**1.      Vesting of Benefits for Welfare Plans**

A court's analysis of what benefits are due depends first on what type of plan is at issue in the case.  In the case at hand, there is no dispute that the IBC plans at issue are employee welfare benefit plans.  See 29 U.S.C. § 1002(1) ("'[W]elfare plan' mean[s] any plan . . . established or maintained . . . for the purpose of providing for its participants or their beneficiaries . . . (A) medical, surgical, or hospital care or benefits . . . .").  The distinction here is important because, as opposed to its treatment of pension plans,

> ERISA exempts severance and other welfare benefit plans from its vesting requirements, see 29 U.S.C. § 1051(1), so that benefits offered under such plans are typically "unaccrued and nonvested." As a result, [e]mployers or other plan sponsors are generally free under ERISA, for any reason and at any time, to adopt, modify or terminate welfare plans.  However, an employer may offer accrued or vested severance benefits, or cede its freedom to amend or cancel a welfare benefit plan, through the terms of the plan itself. Where the plan provides that an employee is irrevocably entitled to

> a certain benefit, and where all of the conditions precedent to the
> employee's receipt of that benefit have been satisfied, that benefit
> is said to have accrued (or "vested" or "ripened") and cannot be
> taken away by plan amendment or termination.  At that point, but
> not before, the employee's rights to benefits become enforceable
> through a typical ERISA section 502(a)(1)(B) action.

Hooven, 465 F.3d at 574-75 (internal citations and quotations omitted).  For welfare plans, then,

a plaintiff must focus on the language of the plan to successfully claim that a benefit has vested

under § 502(a)(1)(B).  As the Supreme Court and the Third Circuit have repeatedly recognized,

this Court may not "rewrite the terms of an ERISA plan."  Henglein v. Colt Indus. Operating

Corp., 260 F.3d 201, 215 (3d Cir. 2001) (citing Ryan v. Fed. Express Corp., 78 F.3d 123, 126 (3d

Cir. 1996)).

### 2.    Principles of Plan Interpretation

There are several core principles that courts utilize in determining whether rights are

"due" to beneficiaries under the terms of the plan.  First, a "plan participant bears the burden of

proving, by a preponderance of the evidence, that the employer intended the welfare benefits to

be vested."  In re Unisys, 58 F.3d at 902.  In considering such a claim, "[a] court must examine

the plan documents.  Extra-ERISA commitments . . . must be found in the plan documents and

stated in clear and express language."  Id. (internal citations omitted).

Second, as briefly noted above, "ERISA plans, like contracts, are to be construed as a

whole.  If the plan document is unambiguous, it can be construed as a matter of law."  Kemmerer

v. ICI Ams., Inc., 70 F.3d 281, 288-89 (3d Cir. 1995) (internal citations and quotations omitted).

> Whether terms in an ERISA Plan document are ambiguous is a
> question of law.  A term is ambiguous if it is subject to reasonable
> alternative interpretations.  In determining whether a particular
> clause in a plan document is ambiguous, courts must first look to

> the plain language of the document.  If the plain language of the
> document is clear, courts must not look to other evidence.  But if
> the plain language leads to two reasonable interpretations, courts
> may look to extrinsic evidence to resolve any ambiguities in the
> plan document.  However, it is inappropriate to consider such
> [extrinsic] evidence when no ambiguity exists.

Bill Gray, 248 F.3d at 218 (internal citations and quotations omitted).

Finally, in interpreting the terms, "breach of contract principles, applied as a matter of federal law, govern claims for benefits due under an ERISA plan," Hooven, 465 F.3d at 572 (internal quotations omitted), and straightforward language in an ERISA plan document "should be given its natural meaning," Bill Gray, 248 F.3d at 220 n.13 (internal quotations omitted).  To the extent that a specific provision conflicts with a general provision, the specific provision controls.  Martin v. U.S. Steel and Carnegie Pension Fund, 2002 WL 32349872, at *4 (E.D. Pa. July 16, 2002) (Bartle, J.) (quoting Capitol Bus Co. v. Blue Bird Coach Lines, Inc., 478 F.2d 556, 560 (3d Cir. 1973)); see also Aramony v. United Way of Am., 254 F.3d 403, 413 (2d Cir. 2001) ("[I]t is a fundamental rule of contract construction that 'specific terms and exact terms are given greater weight than general language.'" (citing Restatement (Second) of Contracts § 203(c) (1981)).

### 3.    Aramony v. United Way of America, 254 F.3d 403 (2d Cir. 2001)

The last principle of interpretation, that a specific provision controls a general one, is the principle most relevant to this Court's decision.  The Second Circuit utilized this principle in Aramony v. United Way of America, 254 F.3d 403 (2d Cir. 2001).  In that case, an individual sued his former employer regarding a supplemental pension plan.  The pension benefits that the senior management, including the plaintiff, at United Way were supposed to receive was

significantly reduced by both a statute and a Revenue rule enacted after the pension was created. United Way therefore set out to establish a supplemental pension plan entitled "Replacement Benefit Plan" ("RBP") to compensate for the reduction in pension benefits.  The purpose of the RBP was to "secur[e] the pension benefit promises made to [United Way's] management . . . who may receive relatively smaller retirement benefits . . . as a result of limitations imposed by the Internal Revenue Code and rulings thereunder."  Id. at 406.  After the purpose paragraphs, the RBP contained specific provisions on how the employees' pension plans would be supplemented and adjusted on the basis of the statute and the rule.

After the RBP was set in place, Congress enacted an additional statute, which again reduced the amount that senior management would receive from their pension plans.  While the insurance company that handled the RBP issued several communications indicating that the RBP would also compensate for this subsequent statute, United Way denied the plaintiff the adjustment in the RBP.  The plaintiff filed suit for, inter alia, violation of ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), the same cause of action as the current case, claiming that the RBP's purpose paragraph required an adjustment for the subsequent statute, despite the fact that this adjustment was not included in the specific administrative provisions of the RBP.

On appeal, the Second Circuit reversed the district court's entry of judgment for the plaintiff.  The court held that the language in the administrative portion of the RBP was unambiguous and did not provide the benefits the plaintiff requested.  Id. at 412.  The court recognized that the administrative provisions of the RBP explicitly provided for benefits to replace income lost due to the initial statute and Revenue rule.  Id.  However, "[n]othing in the operative terms of the RBP makes any reference to replacement of benefits lost because of any

subsequent changes in the Internal Revenue Code. . . . The RBP is extremely precise." Id.

Considering whether the purpose provisions created any conflict or ambiguity since they

appeared to encompass any subsequent statute or Revenue rule that would decrease pension

benefits, the court rejected the plaintiff's argument that there was an ambiguity in the contract.

Recognizing "a fundamental rule of contract construction that 'specific terms and exact terms are

given greater weight than general language," id. at 413, the court held that the purpose

provision's "broad language is limited by the specific operative language of Article V, which

provides only for the replacement of benefit reductions caused by specific existing tax

provisions." Id. at 414.

### 4.      The Formulary and Plavix - Ambiguity Issue

As noted above, this Court must determine whether, by looking at the plain language of

the plan documents, the terms of the plan are ambiguous. Bill Gray, 248 F.3d at 218. Whether

the terms of the plan are ambiguous is a question of law. Id. This Court may only consider

extrinsic evidence if the terms of the plan are ambiguous. Id.

Several principles are consistently and unambiguously established throughout the plan

documents for both Plaintiffs. First, while IBC is required to provide prescription drug benefits

for both Plaintiffs, Plaintiffs are required to contribute to the cost of the prescription drug

purchase with a copay. As to Saltzman:

> •      "Groups may choose to provide additional Prescription Drug coverage for
> Prescription Drugs for use when a Member is not an inpatient. The Benefits and
> Copayments will vary depending upon the program chosen. That coverage may
> also include a Formulary. If so, Members will be given a copy of the Formulary,
> and the coverage may exclude, or require the Members to pay higher Copayments
> for, certain Prescription Drugs. To obtain a copy of the Formulary, the Member
> should call Member Services at the phone number shown on the ID card." (App.

69) (emphasis added); (App. 298).

- "The Prescription Drug Benefits shall be available for Covered Drugs or Supplies dispensed pursuant to a Prescription Order for the out-of-Hospital use of the Member.  **PRESCRIPTION DRUG BENEFITS ARE SUBJECT TO SECTION SC - SCHEDULE OF COPAYMENTS & LIMITATIONS**." (App. 160) (emphasis in original); (App. 437).

- "Covered Drugs or Supplies furnished by a Participating Pharmacy [are covered] without charge <u>except for the Drug Copay</u> for each Prescription Order or Refill." (App. 160) (emphasis added); (App. 437).

- "A Member shall pay to a Participating Pharmacy . . . C.  The Prescription Drug Copayment as specified in SECTION SC - SCHEDULE OF COPAYMENTS & LIMITATIONS."  (App. 165); (App. 444).

In the Chryslerland contract for Saltzman, the Prescription Drug Benefits Summary also states

that:

- "Prescription Drugs contained in the Drug Formulary will be Prescribed and dispensed whenever appropriate, pursuant to the professional judgement of the Primary Care Physician, Referred Specialist and/or the Pharmacist.  <u>Covered Drugs not listed in the drug Formulary shall be subject to the Non-Formulary Drug Copay</u>.  Members will be given a copy of the Formulary and the <u>coverage may exclude, or require, the Member to pay higher Copayments for certain Prescription Drugs</u>.  To obtain a copy of the Formulary, the Member should call Member Services at the phone number shown on the back of the ID card."  (App. 437) (emphasis added).

And in the definitions section of Saltzman's Chryslerland contract, the definition of "Drug

Formulary" also mentions a copay:

- "Covered Drugs not listed in the Drug Formulary <u>shall be subject to the Non-Formulary Drug Copay</u>."  (App. 441) (emphasis added).

For Meister, the copay requirement is established in the Rider.  The schedule establishes

that individuals are required to make a copay for all drugs that the individuals purchase, whether

they be generic, brand name formulary, or brand name non-formulary.  <u>See</u> (App. 747); (App.

-41-

753-54).

Next, the plan documents of both Plaintiffs also unambiguously establish the principle that the copay individuals must make for a brand name drug, as set out in the Schedule of Copayments and Limitations, depends on where the drug is assigned in the formulary.  If the brand name drug is listed on the formulary, then the drug is assigned a Tier 2 copay.  On the other hand, if the drug is not listed on the formulary, the brand name drug is assigned a Tier 3 copay.

For Saltzman, his Rider establishes this copay system in "Section SC - Schedule of Copayments & Limitations."  (App. 164); (App. 445).  Where the insured fills their prescription at a "Participating Pharmacy," the Schedule provides that:

- •   Tier 1—"Generic Formulary Drugs" are assigned a $10 copayment;

- •   Tier 2—"Brand Name Formulary Drugs" are assigned a $20 copayment; and

- •   Tier 3—"Non-Formulary Drugs" are assigned a $35 copayment.

For Meister, his Rider also establishes the copay amounts.  (App. 747); (App. 753-54).  Meister's copays are set at the same amounts:

- •   Tier 1—"Generic Formulary" drugs are assigned a $10 copayment;

- •   Tier 2—"Brand Name Formulary" drugs are assigned a $20 copayment; and

- •   Tier 3—"Non-Formulary" drugs are assigned a $35 copayment.

Finally, the plan documents unambiguously establish the principle that IBC has the ability and the discretion to amend the terms of the plan, including the formulary.  This principle is repeated frequently in both plans.  And, if there was any doubt as to whether it applied to the formulary drug listing, the formulary itself also notes that it is subject to change:

-42-

As for Saltzman's plan documents:

- "[KHPE] may amend this Contract with respect to any matter, including required payments, by mailing a postage prepaid notice of the amendments to the Group at its address of record with Keystone, at least thirty (30) days before the effective date of the amendment.  The Group's concurrence with such amendments shall be established by continuation of payment for coverage hereunder after the effective date of the amendment."  (App. 62) (emphasis added); (App. 269).

- "[KHPE] may, at its option, amend this Contract at least annually.  If the Group does not agree to such change(s), the Group must notify [KHPE] in writing, within thirty (30) days, and the Group may terminate this Contract at the end of the then current Contract term."  (App. 70) (emphasis added); (App. 271).

- "[T]his Contract shall be subject to amendment, modification, or termination in accordance with any provision hereof or by mutual agreement between [KHPE] and the Group without the consent or concurrence of the Members.  By electing [KHPE] or accepting [KHPE] Benefits, all Members legally capable of contracting, and the legal representatives of all Members incapable of contracting, agree to all terms, conditions, and provisions hereof."  (App. 105) (emphasis added); (App. 271).

IBC's ability to amend the formulary for Saltzman is also established in the definition of "Drug

Formulary," included in the Rider:

- Drug Formulary—"a listing of Prescription Drugs preferred for use by the HMO. This list shall be subject to periodic review and modification by the HMO."  (App. 157) (emphasis added); (App. 441).

As for Meister:

- "The Carrier may, at its option, amend this Contract at least annually.  If the Group does not agree to such change(s), the Group must notify the Carrier and the Group may terminate this Contract at the end of the then current contract term."  (App. 626); (App. 761).

The formulary itself also establishes IBC's ability to amend the formulary drug listing:

- "Because prescription drug programs vary by group, the inclusion of a drug in this formulary does not imply coverage.  This formulary was current at the time of printing and is subject to change."  (App. 594) (emphasis added).

-43-

With these three principles in mind, the issue for this Court is whether Plavix at a Tier 2 copay is a "benefit[] due to [Plaintiffs] under the terms of [their] plan" or a "right[] under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). Upon a thorough review of the plan documents, it becomes clear that it is not. IBC is required to provide prescription drug benefits to Plaintiffs, with the caveat that Plaintiffs are required to contribute a copay to each purchase. Under the unambiguous terms of the Plan, the amount of this copay depends on where Plavix is assigned on the formulary. With its discretion to set the terms of the plan, IBC decided to place Plavix in Tier 3 on the formulary. The terms of the plan therefore required Plaintiffs to pay the Tier 3 copay, not a Tier 2 copay.

### 5.    Conclusions as to Terms of Plan

Contrary to Plaintiffs' arguments, the Plans are unambiguous in giving IBC the power to assign certain drugs to certain tiers, and the Plans are unambiguous in their assignment of Plavix at Tier 3. Extrinsic evidence is therefore not necessary for this Court's decision. While Plaintiffs claim that the plan documents establish that Plavix must be provided at the Tier 2 copay, they have not based this claim on any "clear and express language" in the terms of the plan. Plaintiffs have therefore not carried their burden of establishing the claimed right "in the plan documents . . . in clear and express language." In re Unisys, 58 F.3d at 902.

Plaintiffs have offered several arguments to suggest that Plavix is guaranteed at Tier 2.[9] In support of each of these arguments, Plaintiffs have alleged in the Amended Complaint that Plavix is a uniquely effective and indispensable drug for individuals with medical conditions

---

[9] Plaintiffs admit that Plavix was available, and was therefore a covered drug, to any subscriber at all times at the Tier 3 copay.

such as Plaintiffs.  However, the Third Circuit has directed this Court to not consider extrinsic

evidence in determining whether the terms of the plan are ambiguous.  Bill Gray, 248 F.3d at

218.

Plaintiffs first rely on the prefatory language in the formulary as the basis of their ERISA

claim:

> In an effort to continue our commitment to provide you with comprehensive prescription drug coverage, a formulary feature is included in your prescription drug benefit.  A formulary is a list of select FDA-approved, prescription medications reviewed by the Futurescripts® Pharmacy and Therapeutics Committee.  These prescription medications have been selected for their reported medical effectiveness, safety, and value while providing you with the highest level of coverage under your prescription program.

(App. 593) (emphasis added).  Despite the fact that Plavix is not mentioned anywhere in this

paragraph, Plaintiffs contend that this language establishes a commitment on the part of IBC to

place Plavix in Tier 2 since Plavix is such an effective drug.  Plaintiffs contend that the formulary

drug listing is not "comprehensive" and does not provide the "highest level of coverage" since

Plavix is not on the listing.

While the Aramony case did not specifically address whether an insurer's listing of a drug

in a formulary was in violation of the terms of a plan, the Second Circuit nonetheless applied

principles that are directly on point in this case.  The introductory provisions of the formulary

that Plaintiffs rely on are, at their essence, similar to the purpose provisions in Aramony.  As the

purpose provision did in Aramony, the prefatory language in the formulary sets out the general

purpose of how the formulary is intended to operate in the plan.  This paragraph is more like a

general opinion statement of the quality of the formulary drug listing, rather than a concrete

commitment on the part of IBC to place Plavix in Tier 2.  The formulary drug listing, as with the administrative provisions in Aramony, is the more specific provision of Plaintiffs' prescription drug plans.  The prefatory paragraph's "broad language is limited by the specific operative language" of the formulary's drug listing.  Aramony, 254 F.3d at 414.  When the prefatory language of the formulary "is read in conjunction with the highly detailed provisions" of the formulary drug listing, "the finding of ambiguity becomes improbable and unreasonable.  This was clearly a contract written in detailed and precise terms that intended to make its meanings unmistakable clear."  Id. at 413.  Therefore, the prefatory language of the formulary does not sufficiently support Plaintiffs' ERISA claim.

The same is true of Plaintiffs' second argument regarding the definition of "Drug Formulary" in Meister's plan.  "Drug Formulary" is defined there as:  "a list of drugs, usually by their generic names, and indications for their use.  A formulary is intended to include a sufficient range of medicines to enable Physicians, dentists, and, as appropriate, other practitioners to prescribe all Medically Appropriate/Medically Necessary treatment of a Covered Person's condition."  (App. 745) (emphasis added); (App. 752).  Plaintiffs contend that this general language also establishes a commitment to place Plavix in Tier 2 due to its unique effectiveness.

This definition is no different than the prefatory language in the formulary.  It too sets out the general purpose of how the formulary is intended to operate in the plan, and it too appears much more like a general opinion statement.  This definition's "broad language is limited by the specific operative language" of the formulary's drug listing, which places Plavix in Tier 3. Aramony, 254 F.3d at 414.  It would be unreasonable for this Court to "treat the imprecision of the general purpose clause as overriding the specificity of the detailed" formulary drug listing.

-46-

Id. at 413.  Therefore, this language also does not sufficiently support Plaintiffs' ERISA claim.

Finally, Plaintiffs point to the principle of the incentive-driven system of the schedule of copayments.  Plaintiffs contend that the copay schedule is meant to only shift brand name drugs to Tier 3 where there is a generic equivalent available.  They argue that since the generic is no longer on the market, the purpose of putting a drug into Tier 3 is not present, and Plavix should therefore be placed back into Tier 2.  While Plaintiffs' prior two arguments had at least some textual basis, this argument does not.  There is no language in the plan documents that establishes IBC's commitment to maintain this "incentive-driven system" for tier assignment with the formulary.  In considering a § 502(a)(1)(B) claim under ERISA, "[a] court must examine the plan documents.  Extra-ERISA commitments . . . must be found in the plan documents and stated in clear and express language."  In re Unisys, 58 F.3d at 902 (internal citations omitted).  Plaintiffs have failed to establish this incentive-driven principle in "clear and express language," and they merely rely on speculation that the principle is part of the plan and inference from past practices of drug assignments.  This is insufficient to satisfy ERISA's requirements.  Therefore, this Court holds that this argument also fails to carry Plaintiffs' burden for the § 502(a)(1)(B) claim.[10]

_____

[10] In one of their supplemental briefs, after this Court held oral argument, Plaintiffs for the first time have informed this Court that they "are not able to agree that these documents constitute the totality of the contracts between the parties" without additional discovery.  (Doc. 37 at 6 n.8).  The documents that Plaintiffs have presented to this Court, which are discussed above, are insufficient to support their claim here.  Plaintiffs' speculation that there may be other plan documents that may support their claim for Plavix at the Tier 2 copay is insufficient to prevent this Court from adjudicating Plaintiffs' claims on the allegations that they made in the Amended Complaint.  Indeed, the Amended Complaint relies exclusively on the documents discussed above.  And as for Plaintiffs' proposed amendments to their Complaint, these also fail to mention any additional documents that Plaintiffs wish to draw to the Court's attention.  Since these documents are insufficient to carry Plaintiffs' burden, this Court will dismiss Plaintiffs' ERISA claim.

Different prescription drugs have different characteristics.  An insurer may decide that one particular drug should not be included in a formulary because it is cheaper and equally effective to require a subscriber to take two different drugs that accomplish the same medical goals.  Allowing a plaintiff to make an insurer rewrite the terms of a formulary is simply incompatible with the goals that ERISA attempts to achieve.  As the Supreme Court has recognized, "[n]othing in ERISA requires employers to establish employee benefits plans.  Nor does ERISA mandate what kind of benefits employers must provide if they choose to have such a plan.  [Instead,] ERISA . . . seek[s] to ensure that employees will not be left empty-handed once employers have guaranteed them certain benefits."  Lockheed Corp. v. Spink, 517 U.S. 882, 887 (1996) (internal citations omitted).  IBC and Plaintiffs' respective employers did not guarantee their employees that Plavix would be treated as a Tier 2 drug when they started taking the drug.

Plaintiffs' Count I, for denial of benefits under § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), is therefore dismissed with prejudice.

**V.     Proposed Amended Complaint**

Following oral argument, Plaintiffs submitted several pleadings (Doc. 37, 39, 42) requesting that the Court consider an amended complaint and have extensively detailed the allegations they would make in such an amended complaint.  The Court finds that Plaintiffs' proposed amendment would only provide more details about the history and efficacy of Plavix, but these details do not change the basic legal issue—whether this Court can award benefits to Plaintiffs arising out of a dispute about the copay for a specific drug.  Plaintiffs do not dispute that Plavix has been available to them at all times, albeit at a higher copayment level.

Plaintiffs make some mention of the ERISA civil enforcement provision of §

502(a)(1)(A), 29 U.S.C. § 1132(a)(1)(A), for violations of § 502(c) of ERISA, 29 U.S.C. §

1132(c), which applies where a plan administrator "refus[es] to supply <u>requested</u> information" to

the insured.  § 1132(c) (emphasis added).  As Plaintiffs have not alleged, in their Amended

Complaint or in their Motion for Leave to Amend, that any request had been made to Defendants

for plan documents, this civil enforcement provision is inapplicable to the case at hand.  <u>See</u>

<u>Kollman v. Hewitt Assocs., LLC</u>, 487 F.3d 139 (3d Cir. 2007).

      Next, Plaintiffs seek to add a claim because there is "no document designated as the

'summary plan description,'" as required by § 102(a) of ERISA.  However, under the statute that

Plaintiffs rely on, ERISA requires a "plan administrator" to produce the plan description to the

insured.  29 U.S.C. § 1024(b); <u>see also</u> <u>Kollman</u>, 487 F.3d at 143 ("There can be no question that

the statute [29 U.S.C. § 1024] requires the <u>administrator</u> to furnish the SPD upon request."

(emphasis added)).  Defendants have stated that they are not "plan administrators" as ERISA

defines that term.  (Doc. 41 at 11 n.4); (Doc. 43 Ex. A at 2-3).  Plaintiffs have not argued to the

contrary.  Therefore, this claim is also invalid.

      Finally, Plaintiffs also seek to add an additional cause of action for denial of benefits

based on a violation of ERISA's basic requirement that the terms be understandable, asserting

that Defendants' Plan and the related documents are so inherently conflicting, evasive and

difficult for a reasonable person to understand, that Defendants have acted to frustrate the rights

of employers and employees to comprehend the Plan and for employees to obtain benefits due

under the Plan.  Once again, the Court finds that there is no precedent to allow such a claim

under ERISA.  A similar claim, which may be the provision that Plaintiffs rely on, under § 102 of

ERISA, focuses on the summary plan description, not the plan documents; it requires that "the

summary plan description . . . shall be written in a manner calculated to be understood by the average plan participant." 29 U.S.C. § 1022(a).  Plaintiffs have not offered this Court a copy of the summary plan description, and they also have not included any allegations concerning the terms of a summary plan description.  In addition, this Court finds that the terms of the Plan that Plaintiffs have offered, although detailed and perhaps not as readily available as one may like, are understandable and that it is clear from a plain reading that Plavix was always available to Plaintiffs at a level of copay higher than the copay to which Plaintiffs believe they are entitled.  In short, under the Plan documents, copay tiers are not a proper subject matter for the district court relief which Plaintiffs have requested under ERISA.

## VI.    All Other Claims

During oral argument, this Court asked Plaintiffs whether they wished to pursue the state law claims if this Court granted Defendants' Motion to Dismiss.  (Oral Arg. 37:5-14).  Plaintiffs requested that this Court dismiss without prejudice those claims in order to allow Plaintiffs to seek relief in state court.  This Court will abide by Plaintiffs' request and will therefore dismiss Plaintiffs' remaining claims without prejudice to their right to seek relief in state court.

An appropriate Order follows.